## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11 Case Nos.** |
| **PISCES ENERGY, LLC** | § | **09-36591** |
| **PALM ENERGY PARTNERS, LLC** | § | **09-36593** |
| | § | |
| **Debtors** | § | **(Joint Administration Requested)** |
| | § | |

## AFFIDAVIT OF WILLIAM M. GRAY, MANAGING
## <u>MEMBER FOR DEBTORS, IN SUPPORT OF FIRST DAY PLEADINGS</u>

Pursuant to 28 U.S.C. § 1746, William M. Gray, as operating manager for the above styled Debtors, declares and states as follows:

1.     My name is William M. Gray.  I am over the age of eighteen and am fully competent to testify.

2.     I am the co-operating manager of Pisces Energy, LLC ("<u>Pisces</u>") and operating manager of Palm Energy Partners, LLC ("<u>PEP</u>").  Pisces and PEP are referred to herein collectively as the "<u>Debtors</u>."

3.     This affidavit (the "<u>Affidavit</u>") is being submitted in connection with the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and the various "first day" pleadings filed by the Debtors.  I have personal knowledge of the facts contained in this Affidavit.

### <u>Background</u>

A.     <u>The Bankruptcy Cases</u>

4.     On September 1, 2009 (the "<u>Petition Date</u>"), the Debtors each filed voluntary petitions for relief under the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "<u>Court</u>").  The Debtors continue to operate

their business and manage their property and assets as debtors-in-possession under 11 U.S.C. §§ 1107(a) and 1108.

B.    The Debtors' Business Operations and Corporate Structure

5.    The Debtors, along with certain other non-debtor entities, operate a consolidated oil and gas company. The Debtors are engaged in the development, acquisition and exploitation of offshore oil and gas properties in the Gulf of Mexico, with operations located in areas subject to federal jurisdiction on the Outer Continental Shelf ("OCS") off the Texas and Louisiana coasts. The Debtors' headquarters are located in Metairie, Louisiana, with local offices also located in Lafayette, Louisiana and Houston, Texas where many of the companies' creditors are located, particularly including its lender and bonding company.

6.    Pisces is a limited liability company organized under Louisiana law. Pisces is not a publicly traded company. One hundred percent (100%) of its record membership interests are owned by PEP.

7.    PEP is a limited liability company organized under Louisiana law. PEP is not a publicly traded company. I own fifty percent (50%) of the record membership interests in PEP and Jonathan C. Garrett ("Garrett") owns the remaining fifty percent (50%) of the record membership interests in PEP. PEP is a holding company, and does not have any independent business operations. PEP also owns one hundred percent (100%) of the record membership interests in Palm Energy Offshore, LLC ("PEO") and Palm Energy Group, LLC ("PEG"), each a limited liability company organized under Louisiana law.

8.    I and Jon Garrett are the sole responsible managers of the Debtors and have been since inception. I have been CEO of several oil and gas exploration and production companies. I have devoted substantially full time to working on Debtors' matters since their inception, and

have become very familiar with the operations, reserves and business activities of the Debtors. Similarly, Jon Garrett has extensive experience in managing and operating offshore oil and gas properties at a senior level.  As between us, we control and make virtually all material business decisions for the Debtors.  In that context we manage a team of over 30 employees who keep the properties operating, the operations compliant with federal regulations, and in generating strategic plans for continued development and exploitation of new opportunities for Pisces from its existing properties.  In every sense we are integral to the orderly operation of the Debtors and their business.  In addition, we each are integral to the operations of the Debtors in bankruptcy. We are involved in making all business decisions for the Debtors as necessitated by the bankruptcy case.

C.      <u>The Debtors' Property and Assets</u>

9.      Pisces' principal assets consist of 47 offshore leasehold and royalty interests in oil and gas properties, along with related and accompanying rights (the "<u>Pisces Properties</u>"), that, as described below, it acquired from El Paso E&P Company, L.P. ("<u>El Paso</u>") in March 2008.  The leases cover 234,600 Gross and 150,400 net acres in the Gulf of Mexico.  The purchase price designated in the Purchase and Sale Agreement (as subsequently amended, the "<u>PSA</u>") for the Pisces Properties was $235,000,000.00, subject to traditional adjustments as set forth in the PSA.

10.     All of the mineral leases included within the Pisces Properties are located in areas in the OCS under federal jurisdiction.  The majority of the leases are located offshore of Texas and Louisiana, and a few leases are located offshore of Mississippi.  As of June 1, 2009, pursuant to an independent Reserve Report done by the respected firm of Ryder Scott, Pisces had estimated aggregate net proved reserves of approximately 5,043,000 barrels of oil and

47,690,000 cubic feet of natural gas with an aggregated estimated present value in excess of $200 million.

11.     Pisces operates approximately 90% of the Pisces Properties.  It has initially had some initial successful development despite capital constraints, and has a number of exploitation and development opportunities.  Current estimated daily net production in July 2009 comprised 31,334 mcfd and 2685 bopd.  As a result of recent development, production is actually increasing.  Total proved reserves per the Ryder Scott Petroleum Engineers report comprise 78.0 BCFE (or 13.0 million barrels equivalent ("MMBOE").  Probable reserves are 30.4 BCFE (or 5.1 MMBOE), possible reserves are 68.8 BCFE (or 11.5 MMBOE) and gross resource potential of a significant amount above this.  Collectively, Debtors contend the reasonable market value for the Pisces Properties exceeds $200 million, and could be far higher if allowed to be properly exploited and developed.

12.     PEP's principal assets are its ownership of one hundred percent (100%) of the membership interests in Pisces, PEO, and PEG.  Neither PEO nor PEG are debtors in this bankruptcy case.  PEO operates a distinct set of oil and gas properties from the Pisces Properties in federal and state waters offshore the Louisiana coast known as the West Delta properties. PEG provides certain offshore services also unrelated to the Pisces Properties.

D.     The Debtors' Principal Debt Obligations

13.     Pisces. In order to finance the purchase of the Pisces Properties, Pisces entered into a Senior First Lien Secured Credit Agreement (as subsequently amended, the "Credit Agreement") with Macquarie Bank Limited ("MBL") dated March 20, 2008.  The total amount of the loan provided for in the Credit Agreement was originally $210,000,000.00.  In connection with the Credit Agreement, Pisces also executed an advancing term promissory note, a security

4

agreement, certain deeds of trust, and other miscellaneous loan and security documents (collectively with the Credit Agreement, the "<u>Loan Documents</u>").  The purpose of the credit facility provided under the Credit Agreement was to finance Pisces' purchase of the Pisces Properties from El Paso and to provide working capital for the development and operation of the Pisces Properties.  The total amount of the stated credit available under the Loan Documents was $300,000,000.  The total current approximate amount outstanding under the credit facility as of the Petition Date is $155,000,000, and is current.  The principal balance has been reduced $63.8 million since inception almost 18 months ago.  Since the loan was made Debtors have also paid more than $29 million of interest through August 31, 2009 at floating interest rate of LIBOR + 10% (which has been an effective rate of 13% or higher).  No required interest or principal payment has been missed.

14.     Pursuant to the Loan Documents, the obligations due under the Credit Agreement are purportedly collateralized by first priority liens and security interests in all or substantially all of Pisces' property and assets, including the cash and cash equivalents held by Pisces, as more fully described in the Loan Documents.  While it was contemplated that MBL would secure participants on the total loan through a syndication, and on doing so would provide for significant interest  and other relief, this did not occur and, until recently, MBL was the sole holder of the debt, and continues to benefit from the high interest rate charged under the initial loan. [1]  Indeed, MBL continually promised since November 2008 following its failure to syndicate that it would restructure the loan and reduce the interest rate to a commercial loan rate, as contemplated originally.  The Credit Agreement included the following key terms and

---

[1]     On August 31, 2009, Debtors received a Notice of Acceleration and Demand Letter for payment of all amounts due and outstanding, though other documents also transmitted by MBL gave some indication all or some portion of the debt owed might have been transferred or may be transferred to a MBL affiliate named Shelby Energy Holdings, LLC ("Shelby").

provisions which provided MBL with virtual total control over operation of the Debtors' properties, and their development, from inception at imbedded interest rates significantly above what was otherwise then charged by lenders in the market:

(a)     Article II provides $190 million for Tranche A advances toward acquisition of the Pisces Properties and another $20 million[2] for development per the Development Plan.  This sharply limited accessing the total credit available, as stated.

(b)     Further excerpts from the Credit Agreement provide:

"Contract Rate" means a rate per annum equal to the lesser of *(a)* the LIBOR Rate pus 10% and *(b)* the Highest Lawful Rate. . . .

Section 2.2     Fees.

(a)     Arrangement Fee.  Borrower shall pay to MBL a non-refundable arrangement fee equal to $6,000,000 on the Closing Date . . .

Section 2.3     Advance Procedure.  . . . each Advance under Tranche B . . . must be accompanied by copies of all approved AFEs defined in the Development Plan. . . . No Advance will be made for the development of the Properties or the completion of any Well unless that Advance relates to an AFE that has been approved in writing by the Administrative Agent in its sole and absolute discretion . . .

Section 2.5     Interest Calculation. . . .

(c)     Upon the occurrence  . . . of an Event of Default, the outstanding principal amount of the Term Loan shall bear interest at the lesser of *(i)* the Highest lawful Rate and *(ii)* five percent (5%) over the then applicable interest rare (the "Default Rate").  . . .

Section 2.6     Payment.

(a)     . . . Borrower will, subject to Section 2.8(a), pay . . . 100% of the net Operating Cash Flow . . .[to MBL].

(d)     Net Operating Cash Flow will be calculated by Administrative Agent based on the property Operating Statement. . . .

---

[2]  Later this number was increased somewhat.

6

(e)     Payments will be applied <u>first</u> to unpaid fees and Related Costs [of MBL], . . . <u>second</u> to accrued and unpaid interest on the Term Loan, and <u>third</u> to principal on the Term Loan, . . .

Section 2.10   <u>Mandatory Prepayment of the Term Loan</u>. . . . Borrower shall promptly pay to the Administrative Agent . . . 100% of all net proceeds from the disposition of any Collateral . . .

By these terms MBL has repaid itself all interest accruals on the loan, its "arrangement fee," all other fees and costs as it invoiced, and substantial principal reductions such that the debt has been materially reduced in a short period of time.

15.     As a further part of the financing, Pisces was required as a condition to the loan to give MBL a ninety percent (90%) net profits overriding royalty interest ("<u>NPI</u>") conveyance to a wholly owned affiliate of MBL, Macquarie Americas Corporation.  This "upside" NPI provided immediate tangible value based on Debtors' expected valuation both at the closing and also as development operations were implemented.  However, this percentage also was to be reduced substantially on syndication of the loan.

16.     Pisces also has other debts owed to third parties related to its operation of the Pisces Properties.  As a general matter, Pisces was able to pay its trade creditors within terms and without undue delay.  However, recent events have led to some delay in payments as permissions from MBL to pay were not uniformly provided.  The total approximate amount of the trade debt is $8.0 million.  The Debtors also have an insurance premium finance agreement with AFCO which funded the annual premium for General Liability, Excess Umbrella, OPA and the Energy Package, which includes Windstorm coverage.  The balance due to AFCO is approximately $3.8 million and is not past due at this time, although the exigency created by the Demand Letter and acceleration notice may affect this account.  In addition, Pisces has obligations owing to

7

Indemnco, as agent for U.S. Specialty Insurance Company and Lexon Insurance Company (collectively, "Indemnco") on bonds that have been issued to secure Pisces' plugging and abandonment and related obligations arising from its operation of the offshore properties. The bonds issued on the blocks exceed $50 million in amount, and are partially secured by approximately $14.3 million in cash deposited with Capital One Bank, as escrow agent for the bond sinking fund required by the Indemnco indemnity agreement, which was also to be funded sooner under the Credit Agreement. There is an existing obligation to fund further amounts to Indemnco to ensure the bonds are fully backed with deposits, but at this time the obligation is in default in view of the acceleration notice issued by MBL on the afternoon of August 31, 2009. In addition, as operator and joint owner on a number of offshore tracts operated by others, Pisces has other creditors comprising joint owners and other contract parties which give rise to current obligations that are of varying amounts depending upon production and operations. These further obligations are in the potential millions of dollars and are in the process of being evaluated and recorded. Pisces also has an obligation to its employees in the amount of $461,419 which represents employee bonuses granted at the end of 2008, half of which was paid then and the other half is due at the end of 2009.

17.    Pisces also has ongoing royalty obligations on account of production from the Pisces Properties that are owed to the MMS. These are current, and are approximately $1,000,000.00 for the current month, at current prices. Pisces expects to seek leave to pay these for any prepetition amounts.

18.    PEP. PEP, to my current knowledge, has no direct debt obligations other than an obligation owed to AFCO Premium Credit, LLC for insurance premium financing repayments and amounts that may be owed to LA-Lakeway, LLC for leased office space. PEP, however,

pledged its membership interests in Pisces to secure MBL's alleged claims on the MBL Credit Agreement, and its member interest in PEO to the secured creditors (which includes MBL) on the PEO debt as additional collateral securing the credit facility advanced under that separate credit agreement.  PEP also pledged its membership interests in PEO to MBL as security for the separate obligations due MBL under a credit facility obtained by PEO (the "<u>PEO Credit Facility</u>").  The PEO Credit Facility was advanced by MBL and another lender party named Merrill Lynch PCG, Inc. ("<u>Merrill</u>").  The total approximate amount due under the PEO Credit Facility as of the Petition Date is approximately $12,000,000.

E.      <u>Events Leading Up to the Chapter 11 Filings</u>

        <u>The Acquisition of the Pisces Properties</u>

19.     In February 2008, Pisces entered into the PSA with El Paso in which Pisces agreed to purchase the Pisces Properties from El Paso pursuant to the terms and conditions therein.   The purchase price designated in the PSA for the Pisces Properties was $235,000,000.00, subject to purchase price adjustments described in the PSA.

20.     The closing of the purchase of the Pisces Properties occurred in March 2008, and the parties executed various assignments and other instruments as contemplated in the PSA to transfer the ownership of the Pisces Properties to Pisces.  All such assignments into Pisces are believed to have been properly recorded in the appropriate jurisdiction.

21.     As previously noted, Pisces financed the acquisition of the Pisces Properties through the funds available under the Credit Agreement.  The loan from MBL was intended by both parties to be a "bridge" loan that would provide temporary financing to Pisces until the loan was syndicated to other lenders with more tolerable terms for Pisces.  For example, Section 8.6 of the Credit Agreement provides, in pertinent part, that: "<u>Promptly</u> after the Closing Date

[March 20, 2008], MBL <u>will</u> initiate efforts to syndicate and restructure the outstanding amounts under Tranche A and the commitment under Tranche B in accordance with the Term Sheet." (Emphasis added). Under various drafts of a proposed Term Sheet, the syndicated deal would be closed within sixty (60) days of the March 20, 2008 closing. Pisces contends that MBL violated this provision of the Credit Agreement by delaying active pursuit of syndication participants after the Closing Date, thus failing to honor the obligation to "[p]romptly" commence the syndication efforts. Further, Pisces contends MBL failed to syndicate the loan at any time, much less within the specified sixty day period. Pisces contends this violated MBL's obligations under the Credit Agreement and resulted in the permanent maintenance of the onerous terms and conditions of the Credit Agreement which were intended to be only temporary. Further, MBL forced Pisces to incur fees and expenses in the failed effort to timely syndicate the loan. Pisces thus believes at the outset MBL was negligent or in breach of its agreement when it never syndicated the loan. Had MBL timely syndicated the loan, the interest rate on the loan and the terms of repayment would have been reduced and extended substantially. Pisces contends the onerous terms of the Credit Agreement made operations and access to cash difficult for Pisces, and infringed on its ability to fully develop the properties, to timely fund amounts due Indemnco under the bonds, and to otherwise provide the liquidity and cash availability to exploit developing opportunities elsewhere.

<u>The Debtors' Prepetition Restructuring Efforts</u>

22.     The Debtors' revenue is derived from the production and sale of oil and gas and under hedge contracts for the sale of oil and gas. Because of the impact of the 2008 hurricanes, the sudden and dramatic collapse in oil and gas prices in late 2008 and early 2009, as well as the recent unprecedented disruption of the financial markets, the Debtors sustained a natural

10

decrease in business revenue and loss of credit availability by January 2009, though production levels have to Debtors' credit been consistently maintained at stable levels unlike many offshore companies since inception. The 2008 hurricanes in the Gulf of Mexico disrupted operations and caused pipelines to be shut down in Fall 2008, and this had some impact on Pisces operations just as other producers. The prices for natural gas and oil also declined in the fourth quarter of 2008 to the lowest levels since 2001 and only rebounded to normal and expected pricing for oil in Spring 2009. MBL was sweeping the accounts to pay itself, and leaving little for development and operations except pursuant to its own absolute discretion.

23.     Despite the difficulties caused by the hurricanes, the extreme price volatility, and the fact that virtually all cash was being swept to pay the MBL costs and fees, the high interest rate that remained given the lack of any syndication, and some principal, Pisces was continuing to fully perform on the Credit Agreement. Indeed, to this day there has been no monetary default under the Credit Agreement, and to at least June 30, 2009 Pisces contends it never sustained any nonmonetary default under the Credit Agreement. Indeed, Pisces contends it was MBL that initiated breach of the agreements reflected in the Credit Agreement. For example, on November 20, 2008 MBL transmitted a Notice of Default. This related to certain alleged coverage ratios specified in the Credit Agreement, which Pisces disputed were violated. On December 5, 2008 the Parties entered into a Second Amendment to Credit Agreement. This decreased Tranche A to $185,180,430.25 and increased Tranche B to $24,819,569.75. On December 15, 2008, Pisces contends MBL wrongfully transmitted a second Notice of Default. This related to certain coverage ratios specified in the Credit Agreement, which Pisces disputed were violated. On March 6, 2009 MBL transmitted a disputed third Notice of Default. This again related to certain coverage ratios specified in the Credit Agreement, which Pisces disputed were violated.

24.     Pisces contested the various default notices issued by MBL.  By its letters of December 3, 2008, January 15, 2008, and February 6, 2009, Pisces responded to the MBL defaults by reminding MBL (who had approved the PSA prior to funding this transaction) that the PSA with El Paso provided for two post-closing adjustments which would provide cash to Pisces attributable to the time periods noticed by MBL and would, therefore, have a direct impact on the calculation of the Net Operating Cash Flow for the quarter ending June 30, 2008 and the quarter ending September 30, 2008.  This prevented any default from occurring as stated for several reasons:

(a)     The PSA Accounting - The PSA provided for a post-closing adjustment between El Paso and Pisces that would account for revenues and expenses which were accrued between the "Effective Time" of the El Paso transaction (November 1, 2007) and the actual date that it was closed (March 20, 2008).  This adjustment provided for a change in the Base Purchase Price (as that term is defined in the PSA) and would be set forth in a "Final Settlement Statement" to be rendered no later than 180 days after the March 20, 2008 closing.

This obligation was expanded to another situation.  As of the March 20, 2008 closing between Pisces and El Paso, certain of the Properties remained subject to possible third party preferential rights to purchase.  Those particular properties were withheld from the March 20, 2008 and were the subject of a subsequent closing held on May 8, 2008 after the issues relating to preferential rights to purchase had been resolved.

Thus, there were two "Final Settlement Statements" under the PSA, one for the portion of the Properties which were part of the March 20, 2008 closing and one for the portion of the Properties which were part of the May 8, 2008 closing.

As a result of the PSA Accounting, El Paso paid Pisces the sum of $5,995,054.92.

(b)     The Transition Services Accounting - The PSA also provided for El Paso to continue to operate the Properties for a transitional period of time after conveyance of the Properties to Pisces.  During that transition period, various revenues and obligations continued to accrue.  To govern such operations, Pisces and El Paso entered into a Transition Services Agreement which – along with the PSA - provided for accountings between the parties as to the revenues and expenses which occurred during that transition period.  There was an accounting for both the portion of the Properties which were conveyed at the March 20, 2008 closing and for the portion of the Properties then subject to preferential rights to purchase which were subsequently conveyed at the May 8, 2008 closing.

12

As a result of the Transition Services Accounting, El Paso paid Pisces the sum of $7,975,559.47.

25.     There are other reasons Pisces contended no default occurred:

(a)     Section 10.1 of the Credit Agreement allows Pisces a period of ninety (90) days after it is made aware of a supposed default to take the actions to cure such default.  At the time that Pisces received the November 20, 2008 letter from MBL, it was diligently pursuing the efforts to finally resolve the PSA Accounting and the Transition Services Accounting which it accomplished within the ninety (90) day period.

(b)     The sums paid by El Paso to Pisces for the PSA Accounting and the Transition Services Accounting were both attributable to the quarter ending June 30, 2008 (the quarter in which MBL's letter of November 20, 2008 alleges Pisces failed to satisfy the Net Operating Cash Flow required by the Credit Agreement).

(c)     When the amounts received by Pisces pursuant to the PSA Accounting and the Transition Services Accounting are included, Pisces had Net Operating Cash Flow of $34,721,687.63 for the quarter ending June 30, 2008 which far exceeds the requirement established in the Credit Agreement.

26.     Further, Pisces contended the addition of these amounts resulted in cumulative Net Operating Cash Flow of $54,554,923.07 for the quarter of July 1, 2008 through September 30, 2008 which satisfied the Credit Agreement requirement for that period.  Thus, the allegation of default in MBL's letter of December 15, 2008 is not correct.

27.     In conjunction with the series of erroneous default notices that permeated the relationship, MBL also breached the Credit Agreement by refusing to permit funding from the ample cash flow amounts projected to be due for tax payments due in January 2009 on 2008 operations.  This left the ultimate owner taxpayers Gray and Garrett exposed to tax liabilities and penalties.  This led to further disputes.  When efforts to get this funding made failed to result in any consent by MBL for advancement of cash explicitly required by the Credit Agreement, a law suit was filed, as styled: *Pisces Energy LLC and Palm Energy Partners, LLC v. Macquarie Bank Limited*, Civil Action 09-2854, in the United States District Court for the Easter District of Louisiana ("Tax Suit").  Without conceding that any of these six supposed violations were

13

correct, any and all defaults were cured by the entry into the March 11, 2009 Forbearance Agreement and Third Amendment to Credit Agreement by and between Pisces, PEP, Gray, Garrett and MBL in which all of the parties agreed to "set aside any and all disputes" regarding the supposed defaults listed in MBL's three letters outlined above and agreed that MBL would "forbear from the taking of any action" with respect thereto.  This provided a 60 day forbearance period following March 11, 2009; required a mutual release to be signed; required execution of a replacement term note for $300,000,000; provided an approximate $3 million special tax distribution to PEP for further distribution to Messrs. Gray and Garrett, for taxes; sought transfer of Pisces operations at MBL's request from PEO to Pisces; imposed obligations incident to tax payments and returns then due; reaffirmed representations and warranties under the Credit Agreement; required submission of a revised Development Plan; and for dismissal of the Tax Suit.

28.     In May of 2009, MBL approached Pisces with a proposed transaction by which all of the membership interest of PEP (and, thus, the controlling ownership interest in PEP and in PEO) would be sold by Gray and Garrett to Phoenix Rock Acquisition Partners, LLC ("Rock") or some related affiliate or designee.  The proposed transaction would be financed by MBL and one of the effects of the proposed transaction would be the satisfaction and cancellation of the Security Documents, thus relieving Pisces from any further obligations thereunder.

29.     On June 15, 2009, a representative of MBL informed Pisces that a meeting of representatives of MBL and Pisces must be held on the following day to discuss the status of the relationship between the two companies.  On June 16, 2009, representatives of MBL met with representatives of Pisces.  At this meeting, MBL's representatives told the Pisces' representatives that:

(a)      MBL doubted that it would be able to reach an agreement with Rock to finance Rock's acquisition of the PEP membership interests.

(b)      MBL intended to exercise its supposed rights under the Security Documents and foreclose upon the membership interests of PEP.

(c)      MBL desired that PEP and Pisces cooperate with the foreclosure and that PEP transfer the membership interests to MBL in lieu of a formal foreclosure proceeding. However, if PEP and Pisces refused to execute a transfer in lieu of foreclosure, MBL made it clear that it would reserve its supposed right to commence formal foreclosure proceedings.

30.      On June 19, 2009, MBL transmitted to Pisces, PEP, Gray and Garrett a proposed Memorandum of Understanding which set forth MBL's proposal for terms and conditions for a transfer of the PEP membership interests in lieu of foreclosure.  The proposed Memorandum of Understanding was objectionable and did not provide a satisfactory arrangement by which PEP would agree to voluntarily transfer its membership interest in Pisces or PEO to MBL.  Indeed, it made no provision at all for ensuring all creditor claims would be satisfied, nor that the properties would be effectively operated.

31.      In late June 2009 Pisces retained Haynes & Boone to assist in its efforts to restructure the debt.  In meetings with MBL in July 2009 efforts were made to address the issues, and to discuss overall restructuring.

32.      On July 22, 2009 the parties entered into a Forbearance Agreement and Fourth Amendment to Credit Agreement (the "Forbearance Agreement") intended to permit Pisces to explore and report on third party refinancing of the MBL debt, which when taking the gain on pending hedge transactions into account was approximately $115 million.  While this provided a forbearance until August 31, 2009, it also included other provisions intended to permit the parties to move forward on a consensual restructuring path while preserving rights and objections to past or asserted nonmonetary covenant defaults, and other items in dispute.

15

33.     The Debtors retained Pritchard Capital Partners ("Pritchard") with MBL's approval, and prepared an extensive presentation for possible sources of capital.  The Debtors' principals and Pritchard began approaching investors and other potential capital sources in an effort to secure financing to take out the credit facility advanced by MBL or to otherwise provide additional working capital.  Under the Forbearance Agreement, MBL generally agreed not to commence any Enforcement Action (as defined in the Forbearance Agreement) against the Debtors until 5:00 p.m. on August 31, 2009, subject to the terms and conditions therein.

34.     During the forbearance period, the Debtors approached multiple lenders and other financing sources in an effort to obtain financing that would allow them to extinguish the credit facility advanced under the Credit Agreement and would provide needed working capital to develop their oil and gas properties.  The Debtors also met with MBL on multiple occasions during the forbearance period to discuss these prospects, and report on the emerging favorable responses received.  The most recent meeting between the parties occurred on August 25, 2009 as between the business representatives, and the reports received by Pisces were that MBL was favorably disposed to the status and that an extension of the forbearance period would occur and be implemented.  To this end, counsel for Pisces contacted MBL counsel requesting the draft extension to be sent before August 28, 2009, given travel commitments.  No indication if any issue or problem was reported; indeed the indications to Pisces were that the extension would be perfunctorily provided, and it would be easy to document.

35.     Prior to the expiration of the forbearance period, and despite the positive tone of the recent meetings among the Debtors and MBL and indications a further extension would be provided consistent with the Forbearance Agreement, MBL delayed transmission of any draft agreement until later in the afternoon on August 28, 2009, apparently knowing Pisces' Houston

16

counsel was not available.  On the morning of August 31, 2009, Pisces counsel noted several new and material issues with the new proposed draft extension for further communication to MBL:

      (a)    MBL inserted a release of claims to itself.

      (b)    MBL omitted the reservation of rights language from the current Forbearance Agreement.

      (c)    MBL insisted on a further hedging requirement for natural gas.

36.    Later that afternoon, at approximately 3:40 p.m. (even before expiration of the Forbearance Agreement), MBL delivered notices to the Debtors in the furtherance of exercising certain rights under the Loan Documents.  Among other things, the notices made demand for payment and (a) to accelerate the full amount of the obligations due under the Loan Documents, such that those amounts are now immediately due and payable, and (b) to notify the Debtors that MBL may exercise all of its rights and remedies under the Loan Documents.  Moreover, invoking apparent rights triggered by the claimed default, MBL asserted it was voting the member interests in PEP and Pisces to rescind and reverse any resolution passed for either company to file a bankruptcy case, apparently intending to interdict something that never occurred in any event and was not then pending.  Plainly, Debtors do not have the $155 million claimed, and indeed by MBL's calculation it has no intention of providing Debtors any credit for the substantial positive credit position now pending under the hedges.  Moreover, this action and the resultant freeze on cash flow and lack of certainty springing from the surprise action MBL took affects Debtors ability to pay current obligations.

37.    Because of the foregoing, Debtors are required to seek voluntary chapter 11 bankruptcy protection.

<u>**Necessity for Emergency Hearings on "First Day" Pleadings**</u>

17

38.     Contemporaneously herewith, the Debtors have filed the following "first day" pleadings (the "First Day Pleadings"):

a.      Motion for Joint Administration in each of the Debtor's bankruptcy cases;

b.      Debtors' Motion to Extend Deadline to File Bankruptcy Schedules and Statements of Financial Affairs;

c.      Debtors' Motion for Order Authorizing Debtors to Pay Prepetition Salaries, Wages, and for Other Related Relief;

d.      Debtors' Motion for Order (1) Authorizing Continued Use of Existing Business Forms and Records and (2) Authorizing Maintenance of Existing Bank Accounts and Cash Management System;

e.      Pisces Energy, LLC's Motion for Interim and Final Orders (A) Authorizing Use of Cash Collateral; (B) Granting Adequate Protection; and (C) Scheduling a Final Hearing;

f.      Debtors' Motion for Authority to Maintain Insurance Premium Financing; and

g.      Debtors' Application for Interim Order Approving the Retention of Haynes and Boone, LLP as Counsel to the Debtors Pursuant to 11 U.S.C. § 327(a) and Fed. R. Bankr. P. 2014 and 6003 Nunc Pro Tunc to the Petition Date.

**Service of First Day Pleadings**

39.     All First Day Pleadings presented to the Court for consideration will be served by Federal Express for overnight delivery or Express Mail (if Federal Express was unavailable) on all parties identified on Exhibit A to this Affidavit on September 2, 2009.  Likewise, the hearing request for all First Day Pleadings presented to the Court for consideration will be served (a) by Federal Express for overnight delivery or Express Mail (if Federal Express was unavailable) and (b) via facsimile or electronic mail (if the fax number or e-mail address was available) on all parties identified on Exhibit A to this Affidavit on September 2, 2009.

## **Procedural Motions**

### Joint Administration

40.     The Debtors seek an order directing the joint administration of the cases for procedural purposes only, including the joint filing of any disclosure statements and plans of reorganization and other contested matters, pursuant to Federal Rule of Bankruptcy Procedure 1015(b).

41.     The Debtors are "affiliates" as I understand that term as defined in section 101(2) of the Bankruptcy Code.  The issues that will be addressed in these cases will be related and overlapping.  Joint administration of the cases will obviate the need for duplicative notices, motions, applications, hearings and orders, and will therefore save considerable time and expense for the Debtors and their bankruptcy estates and Debtors are affiliates.

42.     The rights of the respective creditors of the Debtors will not be adversely affected by the proposed joint administration because the Debtors will continue as separate and distinct legal entities and will maintain separate books and records.  Additionally, each creditor may still file its claim against a particular bankruptcy estate.  The rights of all creditors will be enhanced by the cost reductions resulting from joint administration.  The Court will be relieved of the burden of scheduling duplicative hearings, entering duplicative orders, and maintaining redundant files for each bankruptcy case.  Finally, the proposed joint administration will simplify the supervision of the administrative aspects of these chapter 11 cases by the Office of the United States Trustee.

### Schedules and Statement of Financial Affairs

43.     The Debtors seek the entry of an order, pursuant to Bankruptcy Rule 1007(a)(5), granting them a fifteen (15) day extension of the deadline by which they must file their

respective schedules (the "Schedules") and statements of financial affairs (the "Statements") so that the Schedules and Statements are due thirty (30) days after the date the Petition Date.

44.     Prior to the Petition Date, the Debtors were unable to assemble all of the information necessary to complete and file their Schedules and Statements required by Bankruptcy Rule 1007(b) because of (a) the exigent nature of the Debtors' bankruptcy filing; (b) the complexity of the Debtors' financial affairs and lack of liquidity; (c) the Debtors' limited financial and accounting staff; and (d) business exigencies incident to the commencement of these chapter 11 cases.  The Debtors have commenced preparation of the Statements and Schedules.

45.     Given the critical matters that the Debtors' limited staff of accounting personnel must address in the early days of these cases, the Debtors will not be in a position to complete the Schedules and Statements by the filing deadline.  I believe that the volume of material that must be compiled and reviewed by the Debtors' staff during the early days of these chapter 11 cases provides ample "cause" for a fifteen (15) day extension of the filing deadline.

**Employment and Payment of Professionals**

46.     The Debtors seek to employ and retain the law firm of Haynes and Boone as bankruptcy counsel for the Debtors, effective as of the Petition Date.

47.     The Debtors have selected Haynes and Boone as their bankruptcy attorneys because of the firm's extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code.  Haynes and Boone has expertise, experience, and knowledge practicing before bankruptcy courts throughout the United States.  Haynes and Boone also has extensive experience in the representation of oil and gas companies in chapter 11 bankruptcy cases.  Haynes and Boone's appearance before this

Court for the matters in these chapter 11 cases will be efficient and cost effective for the Debtors' estate. Haynes and Boone is a full-service law firm with experience and expertise in all other legal areas that may arise during the Debtors' bankruptcy case, including corporate finance, insurance, environmental, tax, and litigation. Haynes and Boone has expended significant resources over the last month working with the Debtors and their affiliates and management to prepare for this bankruptcy filing. In the process, attorneys of Haynes and Boone have become familiar with the Debtors' business operations and have identified legal obligations to various creditor constituencies. Haynes and Boone has also recently participated in certain of the ongoing negotiations with the Debtors' secured creditor, MBL, and thus has familiarity generally with MBL's status and position. If the Debtors are required to retain counsel other than Haynes and Boone, the Debtors would incur additional expenses and delays associated with familiarizing new counsel with the intricacies of the Debtors' financial and legal affairs and business operations.

## **Motions Related to Debtors' Business Operations**

### Use of Cash Collateral

48.     The Debtors have requested interim authority to use cash collateral in accordance with a proposed thirty (30) day interim budget and order, final authority to use cash collateral in accordance with a budget to be submitted before a final hearing, and approval of proposed adequate protection of their pre-petition lenders. While the Debtors' expressly do not stipulate that their pre-petition lenders' alleged liens on the Debtors' cash are valid and enforceable, to the extent that the pre-petition lenders' possess such liens, the Debtors lack sufficient funds, other than cash collateral, to operate until the entry of a final order. Specifically, the Debtors have an immediate need to use cash collateral to continue the operation of their businesses. Without such

immediate access to funds, the Debtors will not be able to pay costs and expenses, including, without limitation, wages, salaries, rent, professional fees, general and administrative operating expenses, or lease operating expenses that arise in the administration of these cases and in the ordinary course of the Debtors' businesses.  The Debtors also need pay MMS royalty and insurance premiums, as well as accruing and due bonding obligations in accordance with a Plan of Reorganization.  The Debtors' inability to timely pay these costs and expenses will result in immediate and irreparable harm to their assets, the estates and their creditors.  The Debtors' request for interim authorization seeks the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the value of their assets.

Insurance Premium Financing

49.     The Debtors have requested authorization to maintain and continue to make payments with respect to a premium financing agreement pursuant to sections 363(b) and 105(a) of the Bankruptcy Code.  The energy package financed under the agreement provides first party coverage for, among other things, property damage to platforms, flowlines, caissons, compressors, and well control, including seepage, pollution, clean-up and containment.  The Debtors propose to pay all obligations due or arising under or related to the premium financing agreement in the ordinary course of business, not on an accelerated basis, and in accordance with the terms of the premium financing agreement and in a manner consistent with prepetition practices.  If the policies were allowed to lapse, the Debtors would be exposed to substantial liability for any damages resulting to persons and property of the Debtors and others. The guidelines of the Office of the United States Trustee also require the Debtors to maintain adequate insurance.  In light of the foregoing, the Debtors believe that the relief requested is essential for the Debtors' reorganization, represents an exercise of the Debtors' sound business

judgment, is in the best interests of the Debtors ' estates and creditors, and is necessary to prevent immediate and irreparable harm to these estates.

### Employee Wages and Benefits

50.     The Debtors seek authority to pay certain pre-petition obligations owed to their employees or those who provide employee benefits, and to honor and continue certain employee benefit programs.

### Prepetition Wages and Salaries

51.     The Debtors currently pay all of their employees through Automatic Data Processing, Inc. ("ADP") twice a month.   The Debtors have approximately 26 salaried employees.  The Debtors' employees are paid on the 15th and the last day of each month, which equates to twenty-four (24) pay periods in a calendar year.  The gross amount of the Debtors' average semi-monthly payroll is $172,000.  This amount is paid by the Debtors to ADP, and ADP then pays each of the Debtors' employees either by check or by direct deposit.  Employees received their last paycheck on the normal semi-monthly date, which includes payments of all amounts owed through the most recently completed payroll period.  Thus, the only pre-petition wages owed are those accrued and unpaid wages for the current semi-monthly period through the Petition Date, essentially one day.  The Debtors are not aware of any employees who exceed the $10,950 cap in prepetition wages and benefits.

52.     A failure to pay any employee would have a negative impact on employee morale, result in a reduction in performance that would be detrimental to Debtors' business, and could cause other necessary employees to seek employment elsewhere.

Employee Benefits

53.     The Debtors provide their employees with insurance for life, short term and long term disability, accident and dismemberment, eyecare, dental, health, and workers' compensation.  The Debtors' average monthly cost is $3,500 for insurance for life, short term and long term disability, accident and dismemberment, which is provided by the Harford Company.  The Debtors' average monthly cost is $2,100 for eyecare and dental care insurance, which is provided by Guardian.  The Debtors' average monthly cost is $28,000 for health insurance, which is provided by Blue Cross Blue Shield.  The Debtors' quarterly cost is approximately $7,800 for workers' compensation insurance.

Expense Reimbursement

54.     Employees and the managers occasionally use their personal credit cards or cash to make purchases on behalf of the Debtors.  The Debtors have no "business credit cards" for employees to use.  Generally, these expenses include items such as travel costs or meals incurred by employees while acting in the scope of their employment.  Such reimbursable expenses typically do not normally exceed $1,000.00 per month.

55.     The Debtors are engaged in a highly competitive business and depend on their ability to retain their existing dedicated employees.  As a result of their employment history with the Debtors, the Debtors' employees have training and institutional knowledge that benefits the Debtors.  Absent the relief requested herein, existing employees and their families will suffer undue hardship because the funds requested to be paid are needed to enable the employees and their families to meet their financial obligations.  If the requested relief is not granted, many of the Debtors' employees may seek other employment.  The Debtors' ability to preserve their businesses and assets and ultimately reorganize will be adversely affected if they are unable to

24

retain their employees.  Accordingly, it is critical that any hardship and disruption caused by these chapter 11 proceedings be minimized in order to preserve morale and maintain the Debtors' workforce.

Oil and Gas Lease Obligations

56.     The Debtors have requested authority to pay undisputed, liquidated, pre-petition royalties arising under their oil and gas leases.  If the Debtors fail to continue paying their lease obligations, it will create a substantial burden upon the estates and pervasive administrative costs and delays to the detriment of all creditors.  Failure to pay will give rise to claims that will need to be addressed prior to the Debtors exiting chapter 11.  Moreover, the Debtors risk losing valuable interests in property if they fail to pay the lease obligations.  Preserving the Debtors' property interests is to the benefit of all creditors, including MBL.  The Debtors will be segregating funds received attributable to interest owners and such funds are effectively of no use to the Debtors.  Affording adequate protection to the interest owners through the continuation of their undisputed regular monthly payments avoids costly disputes and creates no burdens to any party.

57.     MBL asserts liens and mortgages against virtually all of the Debtors' leases.  The payment of the lease obligations serves to benefit the collateral subject to such liens and mortgages by avoiding claims against the collateral by interest owners.  The payments requested by the Debtors will not deplete the estates, but will instead help preserve the value of the estates. The Debtors believe that substantially all of the claims sought to be paid are held by claimants who may be able to assert cancellation rights under valuable leases due to non-payment of the lease obligations.

58.     With approval of the Debtors' use of cash collateral, the Debtors should have sufficient funds to continue making these payments and seek to continue paying such accrued undisputed Lease Obligations in the ordinary course of business.

Cash Management

59.     The Debtors have requested authority to continue using their existing business forms and records, to maintain their existing bank accounts and cash management system, and to pay their monthly bank account fees.  Requiring the Debtor to change its bank accounts, cash management systems and business forms would be costly and disruptive, and would not be beneficial to the Debtors' bankruptcy estates.  The requested relief would allow the Debtors to use their existing bank accounts, cash management systems and business forms.

Existing Business Forms and Records

60.     The Debtors seek a waiver of the requirement that they open a new set of books and records as of the Petition Date.  Opening a new set of books and records would create unnecessary administrative burdens and hardship and would cause unnecessary expense, utilization of resources, and delay.  With the use of computer technology, it is now easy to differentiate between pre- and postpetition transactions by date.  The Debtors, in the ordinary course of their businesses, use many checks, invoices, stationery, and other business forms.  By virtue of the nature and scope of the businesses in which the Debtors are engaged and the numerous other parties with whom the Debtors deal, the Debtors need to use their existing business forms without alteration or change.

Existing Corporate Bank Accounts and Cash Management Systems

61.     The Debtors request authority to maintain their existing bank accounts and cash management systems in accordance with their usual and customary practices to ensure a smooth transition into chapter 11 with minimal disruption to operations.

62.     The Debtors also request authority to close any of the bank accounts if, in the exercise of their business judgment, the Debtors determine that such action is in the best interest of their estates.

63.     Only if the Debtors' bank accounts are continued with the same account numbers can the transition into chapter 11 be smooth and orderly, with minimal interference with continuing operations.  In order to conduct their postpetition businesses, the Debtors need to be able to issue checks to vendors, service providers, employees, and others.  Moreover, as discussed above, a change in the accounts to which customers wire and route payments could delay the Debtors' receipt of funds needed for operations.  By preserving business continuity and avoiding operational and administrative paralysis that closing the existing bank accounts and opening new ones would necessarily create, all parties-in-interest, including employees, vendors, and revenue interest holders, will be best served, and the benefit to the Debtors' estates will be considerable.  The confusion that would otherwise result could only work to the detriment of these chapter 11 cases.

64.     The Debtors each employ a cash management system in the ordinary course of their businesses.  The cash management systems are similar to those commonly employed by corporate enterprises of size and complexity comparable to the Debtors.

65.     The Debtors maintain all of their bank accounts at Capital One Bank.  Each Debtor has a general operating account in its own name.  In addition, Pisces maintains a separate

account that is used for issuance of payments to revenue interest holders, which would include royalty interests.  Pisces also maintains two trust accounts that contain amounts kept in escrow for the purpose of securing certain plugging and abandonment liability.  The Debtors request authority to maintain the Bank Accounts.  The Debtors agree to notify Capital One Bank to convert the existing account to a debtor-in-possession account.

66.     The Debtors will continue to maintain records respecting all transfers between and among the bank accounts so that all transactions can be ascertained after they have occurred. In addition, the Debtors will instruct their banks to add the designation, "Debtor-in-Possession" or "DIP" to their current and any future domestic accounts with each such bank, will treat the accounts for all purposes as accounts of the Debtors as DIPs, and will maintain records that recognize the distinction between prepetition and postpetition transfers.

67.     Additionally, Capital One Bank charges the Debtors monthly fees for maintaining the Bank Accounts.  The amount of the monthly fees varies based on actual usage, and often the Debtors do not incur any monthly fees.  The aggregate monthly fees for the bank accounts are less than $1,100 per month.  The Debtors were current on payment of the monthly fees through August 31, 2009.  The Debtors request authority to continue paying any monthly fees in the ordinary course of business, including any portion of the fees attributable to prepetition services.

## Conclusion

68.     The various relief sought in the First Day Pleadings is all in the best interests of the Debtors' bankruptcy estates, their employees and creditors, and will assist the Debtors in efficiently handling these bankruptcy cases

**I declare under penalty of perjury that the foregoing is true and correct based on my personal knowledge.**

Executed on September 2, 2009.

_____
William M. Gray
Operating Manager for Debtors
Pisces Energy, LLC
Palm Energy Partners, LLC
3850 North Causeway Blvd.
Suite 1770
Metaire LA  70002

29

## EXHIBIT A

**Debtors**

Palm Energy Partners, LLC
Attn: William M. Gray
3850 N. Causeway Blvd., Suite 1770
Metairie, LA 77002
Email: billgray@palmenergypartners.com
Facsimile: 504-831-1528

Pisces Energy, LLC
Attn: John Boylan
1200 Smith Street, Suite 1600
Houston, TX 77002
Email: jboylan@palmenergypartners.com
Facsimile: 713-870-0426

**Debtors' Counsel**

Haynes and Boone, LLP
Attn: Patrick L. Hughes
Attn: Doug Edwards
Attn: Peter C. Ruggero
1 Houston Center
1221 McKinney Street, Suite 2100
Houston, TX 77010
Email: patrick.hughes@haynesboone.com
Email: doug.edwards@haynesboone.com
Email: peter.ruggero@haynesboone.com
Facsimile: 713-547-2600

**Debtors' Professional**

Schully, Roberts, Slattery, & Marino
Attn: Paul J. Goodwine
Attn: Herman E. Garner, Jr.
Attn: Kathleen L. Doody
Attn: Joan Seelman
Energy Centre
1100 Poydras Street, Suite 1800
New Orleans, LA 70163
Email: pgoodwine@schullyroberts.com
Email: hgarner@schullyroberts.com
Email: Kdoody@schullyroberts.com
Email: jseelman@schullyroberts.com
Facsimile: 504-585-7890

**US Trustee**

United States Trustee – Region 5
515 Rusk Street, Suite 3516
Houston, Texas 77002
Facsimile: 713-718-4670

**Governmental and Taxing Authorities**

Federal Agencies:

E. Kathleen Shahan
United States Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 307-0249
Facsimile: (202) 307-0494
E-mail: kathie.shahan@usdoj.gov

Internal Revenue Service
P.O. Box 21116
Philadelphia, PA 19114

U. S. Minerals Management Service
1201 Elmwood Park Blvd.
New Orleans, LA 70123
Facsimile: 504 736-2647

U.S. Minerals Management Service
Royalty Management Program
PO Box 5810
Denver, CO 80217-5810

United States Coast Guard
Vessel Inspection
P.O. Box 70952
Charlotte NC 28272-0952

State Agencies – Louisiana:

State of Louisiana
Office of Attorney General
P.O. Box 94005
Baton Rouge, LA 70804
Facsimile: 225-326-6793

State of Louisiana
Department of Natural Resources
Office of Conservation
P.O.Box 94275
Baton Rouge, LA 70804
Facsimile: 225 342-8199

State of Louisiana
Department of Natural Resources
Office of Mineral Resources
Attn: J. Schott
P.O. Box 2827
Baton Rouge, LA  70821-2827
Facsimile:  225-342-4527

State of Louisiana
Department of Environmental Quality
Financial Services Division
P.O. Box 4311
Baton Rouge, LA  70821-4311
Facsimile:  225-219-3868

Secretary of State
Commercial Divisions
P.O. Box 94125
Baton Rouge LA  70804-9125
Email: commercial@sos.louisiana.gov
Facsimile:  225-925-4726

State Land Office
P.O. Box 44124
Baton Rouge LA  70804-4124

Louisiana Department of Revenue
and Taxation
617 North Third Street
Baton Rouge, LA  70802

State Agencies – Texas:

Secretary of State
State of Texas
P.O. Box 13697
Austin TX  7811-3697

State Comptroller of Public Accounts
Revenue Accounting Division – Bankruptcy Section
P.O. Box 13528
Austin, TX  78711

State of Texas
Office of Attorney General
P.O. Box 12548
Austin, TX 78711
Facsimile:   (512) 477-2348

Railroad Commission of Texas
Oil & Gas Division
1701 Congress Ave.
Austin, TX  78701

**Secured Parties**

Macquarie Bank Limited
One Allen Center, Suite 3100
500 Dallas Street
Houston TX  77002
Facsimile: 713-986-3610

Macquarie Bank Limited
Level 15, No. 1 Martin Place
Sydney New South Wales 2000
AUSTRALIA
Facsimile:  61-2-8232-7780

Macquarie Bank Limited
GPO Box 4294
Sydney NSW  1164
AUSTRALIA

James M. Jordan
Porter & Hedges, LLP
1000 Main, 36th Floor
Houston, TX  77002
Email:  jjordan@porterhedges.com
Facsimile:  713-226-6292

**Insurance Carriers**

AFCO Credit Corporation
12160 Abrams Road
Suite 301-L.B. 51
Dallas, TX  75243-4587
dallas@afco.com

Marsh USA Inc.
Attn: Callie Landry
601 Poydras Street, Suite 1850
New Orleans, LA  70130
customerservice@marchpm.com

Eagan Insurance Agency, Inc.
2629 N. Causeway Blvd.
P.O. Box 8590
Metairie, LA  70002
inquires@eaganins.com

St. Paul Surplus Lines Insurance Co.
c/o J. H. Blades
520 Post Oak Blvd., Suite 250
Houston, TX  77027

Lloyd's of London
c/o Marsh London
Tower Place
London, EC3R 5BU
ENGLAND
enquiries@lloyds.com

Liberty Insurance Underwriters
55 Water Street
New York, NY  10041
Facsimile: 212.208.4112

Ace Indemnity Insurance Com.
Two Riverway, Suite 900
Houston, TX  77056
pam.humphrey@acegroup.com

National Union Fire Insurance Co. of PA
33 Arch Street, Suite 2900
Boston, MA  02110

Arch Insurance Co.
One Liberty Plaza, 53rd Floor
New York, NY  10006
wcasey@archinsurance.com

Zurich American of Illinois
2000 W. Sam Houston Tollway S. #1300
Houston TX  77042
jack.smith@zurichna.com

Lloyd's of London
c/o Ascot Underwriting
5444 Westheimer, Suite 1570
Houston, TX  77056
houston@ascotuw.com

Hudson Insurance Co.
17th Street, 29th Floor
New York, NY  10004
Facsimile:  212-344-29732

New York Marine and General Insurance
913 3rd Ave., 10th Floor
New York, NY  10022
Facsimile:  212-986-1310

Lloyd's of London
c/o Starr Technical Risk
90 Park Ave., 7th Floor
New York, NY  10016

Gotham Insurance Co.
Attn: J. H. Blades
520 Post Oak Blvd., Suite 250
Houston, TX  77027

Indemco
777 Post Oak Blvd., Suite 330
Houston, TX  77056
rbrown@indemco.com
mtyson@indemco.com
effrank@indemco.com

**Gas Contract Parties**

Chevron Natural Gas
Attn: Contract Administration
1500 Louisiana, 3rd Floor
Houston, TX  77002
comment@chevron.com

Cokinos Natural Gas Company
5718 Westheimer, Suite 900
Houston, TX  77057
Christina@cokinosenergy.com
susan@cokinosenergy.com

ConocoPhillips Company
600 North Dairy Ashford (CH1032)
Houston, TX  77079
Facsimile: 281-293-5019

Louis Dreyfus Energy Services, L.P.
20 Westport Road
Wilton, CT  06897
Facsimile:  203-761-8119

Magnus Energy Marketing Ltd.
2745 North Dallas Tollway, Suite 300
Plano, TX  75093
Facsimile:  972-473-2471

United Energy Trading, LLC
215 Union Blvd., Suite 425
Lakewood, CO  80228
Facsimile:  309-991-0988

**Consolidated Twenty Largest Unsecured**

Apache Corporation
P.O. Box 840094
Dallas, TX  75284-0094
Facsimile:  713-296-6481

B & B Oilfield Services, Inc.
P.O. Box 207
Broussard, LA  70518
Ricky.poche@bboilfield.com

C Lift, LLC
P.O. Box  310
Galliano, LA  70354

EOG Resources, Inc.
P.O. Box  840321
Dallas, TX  75284
Facsimile:  713-651-6995

Global Industries Offshore LLC
Dept. 0275
P.O. Box 120275
Dallas, TX 75312-0275
Facsimile:  281-529-7980

Knight Well Services
P.O. Box 53616
Lafayette, LA  70505
Facsimile:  337-233-0438

Laborde Marine Crewboats II LLC
601 Poydras Street
Ste. 1725
New Orleans, LA  70130
Facsimile:  985-399-9503

Offshore Process Services, Inc.
1206 Park Dr., Suite 200
Mandeville, LA  70471
Facsimile:  985-727-2950

Powerhouse, Inc.
130 North Bernard
Broussard, LA 70518
wade@powerhousedecompression.com

Rotorcraft Leasing Company, LLC
P.O. Box  975365
Dallas, TX  75397-5365
jriggs@rlcllc.net

Shell Offshore Inc.
P.O. Box 7247-6265
JV Receipts
Philadelphia, PA 19170-6265
Phil.b.smith@shell.com

Superior Energy Services LLC
Dept. 2203
P.O. Box 122203
Dallas, TX  75312-2203
Charlie.hardy@superiorenergy.com

Talens Marine & Fuel, Inc.
P.O. Box 676871
Dallas, TX  75267-6871
Facsimile:  337-774-3503

The Grand Ltd.
13385 Murphy Road
Stafford, TX  77477

TOP COR Offshore
12025 Industriplex Blvd.
Baton Rouge, LA  70809-5131

Total E&P USA, Inc.
P.O. Box 200074
Houston, TX  77216-0074

Venture Transport Logistics, LLC
P.O. Box 974167
Dallas, TX  75397-4167

W & T Offshore, Inc.
Dept. 611, P.O. Box 4346
Houston, TX  77210-4346

Warrior Energy Services
P.O. Box  122114
Dept.  2114
Dallas, TX  75312-2114